934 F.2d 1304
 20 Fed.R.Serv.3d 542
 In re John EDMOND, d/b/a Landover Contact Lens Center, Debtor.
John EDMOND, Plaintiff-Appellant,
v.
CONSUMER PROTECTION DIVISION, OFFICE OF the ATTORNEY GENERAL
OF THE STATE OF MARYLAND, Defendant-Appellee.
 No. 89-2957.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 4, 1991.
Decided May 28, 1991.
 
 Pamela Lynn Lyles, argued, Washington, D.C., for plaintiff-appellant.
 Margaret Hartka, Law Student, argued (Roger C. Wolf, Sp. Asst. Atty. Gen., on brief), Consumer Protection Div., Office of the Atty. Gen., Baltimore, Md., for defendant-appellee.
 Before WIDENER and MURNAGHAN, Circuit Judges, and McMILLAN, Senior United States District Judge for the Western District of North Carolina, sitting by designation.
 MURNAGHAN, Circuit Judge:
 
 
 1
 The Consumer Protection Division, Office of the Attorney General for the State of Maryland ("the Division"), brought an action against John Edmond in bankruptcy court to forestall discharge. The Division sought to protect the possibility of eventual recovery on an administrative judgment rendered against Edmond for violations of Maryland's Consumer Protection Act (the "Act"), Md.Com.Law Code Ann. Secs. 13-101-501. Edmond has resisted, seeking summary judgment, sanctions pursuant to Federal Rule of Civil Procedure 11, and dismissal for failure to comply with Federal Rule of Civil Procedure 23, applicable to class actions. His efforts have not succeeded before the bankruptcy court or on appeal to the district court.
 
 I.
 
 2
 The Division initially had brought an administrative action under the Act to obtain an injunction and an order of restitution against John Edmond individually, and d/b/a Landover Contact Lens Center and d/b/a Landover Labs, on April 7, 1986. The Division asserted, "among other things, that lenses ordered and paid for were not received; that promised refunds were never made; and that unconditional satisfaction was not provided." After a two-day hearing, on February 26, 1987, the hearing officer determined that Edmond had violated Sec. 13-301(1) of the Act. Apparently, during the administrative proceedings, Edmond filed for bankruptcy.
 
 
 3
 The Division then filed in the bankruptcy court an action opposing dischargeability on March 16, 1987, under 11 U.S.C. Sec. 523(a)(2)(A), "on behalf of itself and all consumers listed in debtor's schedules...." On February 29, 1988, Edmond moved for summary judgment, offering his own affidavit in support of his motion. The Division objected because, it argued, Edmond had asserted his Fifth Amendment privilege throughout discovery frustrating the mounting of a solid defense to the summary judgment motion. According to Edmond, at a hearing on June 7, 1988, "the Court offered appellant the choice of submitting to a deposition or having the motion for summary judgment denied." Edmond refused to submit to the deposition. Denial of summary judgment followed.
 
 
 4
 Prior to and during the trial, Edmond had sought to dismiss on the grounds that the Division had failed to obtain class certification and to follow the procedural requirements of Rule 23. The bankruptcy judge found that class certification would have been unnecessary: "This was not a class action but rather an action brought by the Attorney General as parens patriae."
 
 
 5
 As for Rule 11 sanctions, Edmond's basis for the claim of sanctions was an assertion that the Division had failed to abide by the court's scheduling order, had made materially false statements to the court, had filed a complaint which had no factual or legal basis while relying on discovery to prove its claim, and had refused to move for class certification. The bankruptcy judge concluded that "[b]ecause the plaintiff has prevailed, however, the court will decline to allow sanctions requested by debtor." The judge also rejected Edmond's claim that a witness had fabricated testimony and that the action was driven, in part, by the "vindictiveness" of the Attorney General.
 
 
 6
 So far as discharge was concerned, the judge determined that the debts, including "all consumer claims arising after October 11, 1985" and other specific additional claims arising prior to that date, were nondischargeable.[1]
 
 
 7
 The district court affirmed the bankruptcy judge's decision:
 
 
 8
 Upon review of the briefs, the Court has determined that oral argument is not needed. The appeal is essentially frivolous, the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.
 
 
 9
 The district judge stated that the denial of Rule 11 sanctions was well within the bankruptcy judge's discretion, "especially since neither side ... adhered strictly to the pretrial procedures."[2] The judge also upheld the bankruptcy judge's denial of summary judgment, concluding that it "would have been unfair to allow the appellant to sandbag the appellee...." The Rule 23 contention was regarded as "frivolous." In addition, the district court concluded with the statement that "it is plain that the appellant was not clearly entitled to judgment in his favor...."[3]
 
 II.
 A. Summary Judgment
 
 10
 On summary judgment, in the bankruptcy court or on appeal, the same standard is employed. The facts must be construed in the light most favorable to the nonmoving party, with the burden on the moving party "to demonstrate the absence of any genuine issue of material fact." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir.1985). Federal Rule of Civil Procedure 56 permits a party to move for summary judgment "without affidavits," Fed.R.Civ.P. 56(b), and authorizes the judgment to be rendered after examination of "the pleadings, depositions, answers to interrogatories, and admissions on file." Fed.R.Civ.P. 56(c). Either party, however, also may supply affidavits, which, in turn, the court "may permit ... to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." Fed.R.Civ.P. 56(e). When the moving party supports the motion with affidavits, "an adverse party may not rest upon the mere allegations or denials ... but, by affidavits or as otherwise provided ..., must set forth specific facts showing there is a genuine issue of material fact." Id.
 
 
 11
 Edmond has emphasized that the Division never produced any affidavits or other documents in opposition to the summary judgment motion but only made allegations termed conclusory. In addition, Edmond has argued that the bankruptcy court incorrectly conditioned summary judgment on his refusal to be deposed and did not sufficiently consider the Division's statement that it was "still awaiting discovery two weeks prior to trial."
 
 
 12
 The Division has responded that Edmond never even met his initial burden of establishing the absence of a genuine issue. The Division, in opposition to the motion, has pointed to genuine issues present in the pleadings and depositions: the administrative hearing's findings, depositions of consumers, and bank records that suggested financial improprieties. According to the Division, Edmond had based his summary judgment motion on "substantial hearsay statements which were not part of the record and were supported only by his unverified affidavit." The Division had requested, consequently, that the bankruptcy judge strike the affidavit and hearsay statements or else compel Edmond to respond to a deposition. The Division's position has been that, by submitting an affidavit, Edmond waived his Fifth Amendment privilege against self-incrimination. Characterizing the judge's discussion with Edmond as "the choice of either submitting to a deposition or having his affidavit and hearsay statements struck," the Division has claimed that, when Edmond refused to be deposed, the judge, in essence, struck the material leaving nothing to support the summary judgment motion.
 
 
 13
 Edmond's efforts to secure a grant of summary judgment were destined to fail. At the hearing on the motion, the bankruptcy court judge first attempted merely to give the Division time to depose Edmond. The judge noted that Edmond could not "have peanut butter on both sides of his bread...." He stated that by submitting the affidavit, Edmond waived his privilege; therefore, the judge would "enter an order compelling the discovery." The judge declared that after the deposition he would consider again the summary judgment motion. Edmond's counsel implied that the dates suggested for the deposition by the Division were unsatisfactory, apparently because counsel felt that the Division had been given adequate time for discovery. The judge then told Edmond's counsel, "the alternative is to deny your motion for summary judgment and hold the June 20 trial." Counsel responded, "Sir, we would like to proceed with the June 20th trial date." The judge concluded by denying the motion for summary judgment and the motion to compel discovery from Edmond.
 
 
 14
 Although the best characterization of the colloquy between the judge and counsel may be somewhat unclear, the propriety in denying summary judgment is not debatable. Affidavits submitted on summary judgment do not deserve to receive unthinking acceptance by the court. In Rohrbough v. Wyeth Laboratories, Inc., 916 F.2d 970 (4th Cir.1990), the Fourth Circuit held that "the district court was justified in disregarding the affidavit" submitted by a party opposing summary judgment. Id. at 975. The court emphasized that the affidavit contradicted prior deposition testimony by the affiant. See id. at 976. Unlike Rohrbough, the present case does not even raise the problem of conflicting versions of testimony. By selectively asserting his Fifth Amendment privilege, Edmond attempted to insure that his unquestioned, unverified affidavit would be the only version. But the Fifth Amendment privilege cannot be invoked as a shield to oppose depositions while discarding it for the limited purpose of making statements to support a summary judgment motion.
 
 
 15
 The Supreme Court has written, " 'That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination.' " United States v. Rylander, 460 U.S. 752, 759, 103 S.Ct. 1548, 1553, 75 L.Ed.2d 521 (1983) (quoting Williams v. Florida, 399 U.S. 78, 83-84, 90 S.Ct. 1893, 1896-97, 26 L.Ed.2d 446 (1970)). In the context of cross-examination, courts have struck testimony when the defendant has invoked the Fifth Amendment to refuse to respond to cross-examination questions. See Lawson v. Murray, 837 F.2d 653 (4th Cir.), cert. denied, 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988) (striking testimony of witness who invoked the Fifth Amendment during cross-examination); United States v. Baker, 721 F.2d 647 (8th Cir.1983) (disregarding direct testimony after defendant invoked the Fifth Amendment to prevent cross-examination); United States v. Sack, 118 F.R.D. 500 (D.Neb.1987) (concluding, in the context of a decision denying use immunity in a civil suit, that the litigant had to choose between taking the Fifth Amendment and losing, or answering the discovery questions and potentially fueling a grand jury criminal investigation). The cases demonstrate that the Fifth Amendment is "not a 'positive invitation to mutilate the truth a party offers to tell.' " Lawson, 837 F.2d at 656.
 
 
 16
 The same principle applies when a party seeks to invoke the Fifth Amendment to avoid discovery while offering an affidavit to compel a certain result on summary judgment. An affidavit operates like other testimonial statements to raise the possibility that the witness has waived the Fifth Amendment privilege. See United States v. Parcels of Land, 903 F.2d 36, 43 (1st Cir.1990); Klein v. Harris, 667 F.2d 274, 287 (2d Cir.1981). The First Circuit recently has held that a district court "had ample authority" to strike a defendant's affidavit submitted in opposition to a summary judgment motion. The defendant had "invoked the fifth amendment and refused to answer the government's deposition questions." Parcels of Land, 903 F.2d at 43. In Parcels of Land, the defendant attempted to oppose summary judgment; nevertheless, the reasoning applies equally to a defendant's attempt to gain summary judgment.[4]
 
 
 17
 The bankruptcy judge asked Edmond if he would consent to a deposition. Edmond's refusal to do so justified the judge's decision to strike the affidavit. With the affidavit removed from consideration, Edmond could not meet his "initial responsibility" to point out that there was an absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986). Indeed, the pleadings, depositions, and records identified by the Division in its response indicated the opposite conclusion. The denial of the summary judgment motion was correct.[5]
 
 B. Rule 23 Class Certification
 
 18
 At the heart of the appeal lies Edmond's claim that the Division had to, but failed to, comply with Rule 23. The Division never attempted to have a class certified or to follow Rule 23's procedural requirements. And, according to Edmond, the Division has not contacted, at any time over the past four years, the consumers who originally had lodged complaints and has no plan for ensuring that refunds reach those consumers. Without class certification, according to Edmond, the Division lacked standing to bring and prosecute the action. Both the bankruptcy judge and the district judge, to the contrary, have reasoned that the parens patriae doctrine justified the Division's approach.
 
 
 19
 First, in support of his argument, Edmond has argued that a state suit to recover monetary damage on behalf of individual citizens is "not a valid parens patriae action": a parens patriae action must benefit all, not merely individual, citizens; Edmond has asserted that the Division cannot return the damages to the aggrieved citizens and has no authority to keep the money in the state treasury. Second, Edmond has gone on to assert that, even when a state prosecutes under the parens patriae doctrine, arguably giving it standing to bring the action, it still must seek certification of a Rule 23 class to ensure standing as the class representative. Third, Edmond has insisted that Rule 23 applies regardless of state law, and in any case, Maryland law requires notice to consumers. Fourth, Edmond has proceeded to claim that, because Rule 23 was not followed, no class action was certified, and therefore, the judge erred in imposing class-wide liability. Fifth, advancing from premise to premise, Edmond has stated that the Division cannot now seek to have the class certified under Rule 23 because it would be too late and the Division has not fairly and adequately protected the interests of the class.
 
 
 20
 The Division's response has sought to argue that the Act confers upon the Division standing which is not representative in nature. Rather, according to the Division, it can sue to collect monies owed to bring about restitution or to require disgorgement for the public good. The Division claims that the state can keep such monies if consumers cannot be located. Second, the Division has emphasized that, when a state proceeds as parens patriae, it does not need to seek class certification; the right to proceed as parens patriae is not restricted to only those cases leading necessarily to the individual benefit of some consumers. A bankruptcy action, the Division notes, only preserves the state's causes of action from discharge in bankruptcy; it does not determine or provide for recovery of damages. Furthermore, the Division has asserted that, if certification is required, it can defer certification until after a determination of liability has been made.
 
 
 21
 The concept of parens patriae (translated "the father of the country") gives a state standing to sue when the state seeks to protect a quasi-sovereign interest. In Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez, 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982), the Supreme Court articulated the rough boundaries of parens patriae standing. The state must be more than a "nominal party without a real interest of its own," id. at 600, 102 S.Ct. at 3265; it "must articulate an interest apart from the interests of a particular private parties...." Id. at 607, 102 S.Ct. at 3268-69. Such quasi-sovereign interests, broadly formulated, "consist of a set of interests that the state has in the well-being of its populace." Id. at 602, 102 S.Ct. at 3266. In particular, " 'a State has a quasi-sovereign interest in the health and well-being--both physical and economic--of its residents in general.' " Id. at 607, 102 S.Ct. at 3269. In addition, although the injury from the challenged activity must affect more than just an "identifiable group of individual residents," indirect effects of the injury may be considered. The Supreme Court suggested that parens patriae standing often occurs in areas where the state "would likely attempt to address [the injury] through its sovereign lawmaking powers." Id.
 
 
 22
 In pursuing the action against Edmond, the Division has acted pursuant to the Act. The Act confers upon the Division an interest apart from that of any individual injured consumer. The Division "acts as an arm of the Attorney General, entrusted with broad powers to enforce and interpret the Consumer Protection Act ... and with a mandate to protect and promote the welfare of consumers." Consumer Protection Div. Office of Atty. Gen. v. Consumer Pub. Co., 304 Md. 731, 745, 501 A.2d 48, 55 (1985); see Sec. 13-204(11). Two aspects of Maryland law make explicit that the Division acts on behalf of the state's quasi-sovereign interest when it pursues actions under the Act.
 
 
 23
 First, the Act permits the Division to initiate administrative hearings to obtain a cease and desist order "on its own initiative." See Consumer Protection, 304 Md. at 758, 501 A.2d at 62. The Division may conduct a hearing "in the absence of consumer complaints." 304 Md. at 758, 501 A.2d at 63. Section 13302 prohibits actions which violate the Act "whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice." The Act contemplates enforcement by the Division without regard to individual consumers.
 
 
 24
 Second, Maryland law has construed the restitution provision of the Act to embody the state's interest in disgorging the benefit from the violator. The Act states that, at the conclusion of an administrative hearing, an order may issue "requiring the violator to cease and desist from the violation and to take affirmative action, including the restitution of money or property." Sec. 13-403(b)(1). In Consumer Protection, the Maryland Court of Appeals considered the restitution provision. The Court concluded that the Division did not need to prove individual reliance to maintain the restitution order because the state had an interest in disallowing the retention of ill-gotten gains.[6] See Consumer Protection, 304 Md. at 779-81, 501 A.2d at 73-74. The Division's ability to require disgorgement over and above that which will be returned to individuals was emphasized in State v. Andrews, 73 Md.App. 80, 84-89, 533 A.2d 282, 284-87 (1987). After summarizing the procedure by which individuals would receive refunds, the Maryland Court of Special Appeals added:
 
 
 25
 We recognize ... that "[to] permit the [retention of] even a portion of the illicit profits would impair the full impact of the deterrent force that is essential if adequate enforcement [of the law] is to be achieved. One requirement of such enforcement is a basic policy that those who have engaged in proscribed conduct surrender all profits flowing therefrom." (brackets in original) We do not by this opinion intend to preclude the circuit court, upon remand, from implementing the above principle, if applicable, in this case.
 
 
 26
 73 Md.App. at 89 n. 7, 533 A.2d at 287-88 n. 7.
 
 
 27
 Maryland law recognizes that the Act embodies a broad state interest in protecting all consumers, present and future. The Division's authority and interest under the Act extend beyond mere representation of particular individual consumers. When proceeding under the Act, the Division serves a quasi-sovereign interest, the presence of which confers parens patriae standing.
 
 
 28
 Other courts have concluded that state agencies participating in bankruptcy proceedings under consumer protection acts have standing to sue because of the parens patriae doctrine. For example, in In re Sclater, 40 B.R. 594 (Bankr.E.D.Mich.1984), the judge held that the Michigan Attorney General had standing under the parens patriae doctrine. The court wrote,
 
 
 29
 [t]he Attorney General is thus seeking to protect Michigan residents from fraudulent and deceptive practices under a mandate from the state legislature addressing this specific type of injury. The use of the parens patriae doctrine to establish the Attorney General's standing in this proceeding is in direct conformity with the Snapp ... guidelines.
 
 
 30
 40 B.R. at 597.[7] In In re DeFelice, 77 B.R. 376 (Bankr.D.Conn.1987), the judge found that the New York Attorney General had standing under the parens patriae doctrine. The judge explained that
 
 
 31
 the state's interest in vindicating its consumer protection laws in its courts is directly linked to its attempt to block the discharge of listed debts in this court.... The fact that individual consumers would also benefit from the Attorney General's action does not subvert that quasi-sovereign interest.... New York's quasi-sovereign interest is served whenever the perpetrators of consumer fraud within its borders are brought to justice regardless of whether their victims happen to be citizens.
 
 
 32
 Id. at 380. Cf. In re Black, 95 B.R. 819 (Bankr.M.D.Fla.1989) (finding that the Federal Trade Commission was a creditor in its own right pursuant to congressional mandate and thus had standing to seek nondischargeability of debts); In re Klein, 39 B.R. 927, 929 (Bankr.E.D.Pa.1984) (concluding that the Maryland Attorney General had standing to litigate the dischargeability of debts because "the Attorney General has been vested by state law with the power to secure restitution under the Maryland Consumer Protection Act on behalf of aggrieved parties....").
 
 
 33
 Cases cited by Edmond are distinguishable. In re Hanson, 104 B.R. 261 (Bankr.N.D.Cal.1989), criticized DeFelice (perhaps the more felicitous of the decisions) only "to the extent it would allow a state to bring a dischargeability action without a state law authorizing the state to sue." Id. at 262. In the Act, Maryland provides such a law. In re Hanson involved a class action by eleven investors--not by a government entity--and focused on whether a class dischargeability action could be maintained. Although the In re Hanson court rejected the notion, in In re Duck, 122 B.R. 403 (Bankr.N.D.Cal.1990), another judge from the same district, in a later decision, rejected In re Hanson 's conclusion and held that "a class dischargeability action may be maintained in bankruptcy court." Id. at 406.
 
 
 34
 In addition, because Maryland courts have construed the Act to permit disgorgement in the absence of individual complaints and to serve the state's broader interest, People of State of N.Y. by Abrams v. Seneci, 817 F.2d 1015 (2d Cir.1987) and In re Lacy, 74 B.R. 23 (Bankr.D.Or.1987), are not persuasive. In In re Lacy, the court rejected a parens patriae standing argument by the state because the state law did not "grant the state the power to collect restitution for the victims" or "enforce restitution orders." 74 B.R. at 25. In Seneci, the state had sought a treble damages award under the federal RICO statute for injuries suffered by citizen consumers. The court explained that parens patriae standing would not lie because the state was suing "in a representative capacity. ..." 817 F.2d at 1017. If the state had asserted "a quasi-sovereign interest of the state itself," the court emphasized, "parens patriae standing would undoubtedly exist." Id. Maryland considers violations of the Act an injury contrary to its quasi-sovereign interest.
 
 
 35
 Furthermore, the Act's inclusion of a possible private right of action does not affect the state's ability to achieve standing under the parens patriae doctrine. Section 13-408 provides that the private action is "in addition" to any action by the Division. As the court in Andrews noted,
 
 
 36
 By providing for a "public remedy" through the Office of the Attorney General, in addition to the private right of action referred to in Sec. 13-408, the General Assembly implicitly recognized that many consumers will be deterred from pursuing individual actions due to the cost and time involved in private litigation.
 
 
 37
 73 Md.App. at 85, 533 A.2d at 285. The Act does not directly address whether a person would be precluded from recovering under the Division's action and under a private action. However, the decisions in Consumer Protection and Andrews, requiring that a procedure be set up to process individual claims, appear to ensure that an individual who received money under a private right of action could not also receive money from the Division's actions for the same injury. See Consumer Protection, 304 Md. at 781, 501 A.2d at 74; Andrews, 73 Md.App. at 87-89, 533 A.2d at 286; see also Attorney General of Maryland v. Dickson, 717 F.Supp. 1090, 1105-06 (D.Md.1989), appeal dismissed, 914 F.2d 247 (4th Cir.1990) (suggesting that under the Act consumers are prohibited from receiving a "windfall" or "double return"). Concerns about lack of notice to particular consumers or double recovery do not seem very substantial. Once the Division has secured the nondischargeability determination, the court, the Division, and Edmond can discuss the propriety of actions to obtain monetary recovery and decide what procedures, if any, are necessary to notify potential claimants and to allow justified recoveries. Also to be ascertained is whether the state can retain some money to fulfill the Act's purposes in the absence of individual claimants.[8]
 
 
 38
 In conclusion, the Act gave the Division parens patriae standing to proceed against Edmond in bankruptcy court. The Division acted, not as a class representative, but on behalf of the state's quasi-sovereign interest in ensuring consumer protection and in securing its borders against violations. Throughout the proceedings, the Division has represented only itself. There being no class, class certification and other aspects of Rule 23, therefore, would have been inappropriate. Although the Division, under Maryland law, eventually may have to provide a procedure to notify and process individual consumers' desire for reimbursement, the failure to do so does not alter the Division's ability to ensure that the Act's provisions for restitution will not be eviscerated.
 
 C. Rule 11 Sanctions
 
 39
 Edmond argues that Rule 11 sanctions should have been imposed because
 
 
 40
 appellee violated Rule 11 by filing a complaint which had no factual or legal basis, relying on discovery to uncover evidence to prove its claim; violated Rule 11 by refusing to support its opposition to appellant's motion for summary judgment with facts as required by Rule 56; and acted in bad faith by forcing appellant to move for a restraining order and refusing to move for class certification.
 
 
 41
 If such an argument is still pressed in light of the outcome, particularly on the parens patriae issue, it needs only to be pointed out that the imposition of Rule 11 sanctions is left to the discretion of the judge. See Rossman v. State Farm Mut. Auto. Ins. Co., 832 F.2d 282, 290 (4th Cir.1987); Langham-Hill Petroleum Inc. v. Southern Fuels Co., 813 F.2d 1327, 1331 (4th Cir.), cert. denied, 484 U.S. 829, 108 S.Ct. 99, 98 L.Ed.2d 60 (1987). The Fourth Circuit follows an objective reasonableness test for the imposition of Rule 11 sanctions: "whether 'a reasonable attorney in like circumstances would believe his actions to be factually and legally justified.' " Artco Corp. v. Lynnhaven Dry Storage Marina, Inc., 898 F.2d 953, 956 (4th Cir.1990) (quoting Cabell v. Petty, 810 F.2d 463, 466 (4th Cir.1987)).
 
 
 42
 In the present case, the district court judge did not need to conduct a hearing. See Miltier v. Beorn, 896 F.2d 848, 855 (4th Cir.1990); Deadwyler v. Volkswagen of America, Inc., 884 F.2d 779, 784 (4th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1131, 107 L.Ed.2d 1037 (1990). Both sides presented arguments for and against sanctions in the briefs. The district court judge stated that "the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument." The judge referred to the Division's success in responding to Edmond's allegation that sanctions should be imposed because the complaint was not grounded in fact. He did not hold that a prevailing party such as the Division is necessarily immune from sanctions under Rule 11. The Division's actions, with respect to the complaint, summary judgment, and the class certification issue, were those of an objectively reasonable lawyer, and so the Rule 11 motion was properly denied.
 
 
 43
 AFFIRMED.
 
 
 44
 WIDENER, Circuit Judge, concurring and dissenting:
 
 
 45
 While I concur in most of the reasoning of the majority opinion and with some of the results obtained, I respectfully dissent to its holding that the State of Maryland could litigate with respect to the individual claims on behalf of the numerous people whom Edmond is claimed to have defrauded without treating that litigation as a class action under Rule 23.
 
 I.
 
 46
 The majority decision correctly states that the bankruptcy court did not give preclusive effect to the administrative judgment rendered against Edmond. Op. at 1306, n. 1. The bankruptcy court held that it was " ... unable to find based upon the record that the proposed findings are a final decision of an administrative agency and, therefore, entitled to the issue preclusion described in U.S. v. Utah Construction & Mining Co., 384 U.S. 394, 422 [86 S.Ct. 1545, 1560, 16 L.Ed.2d 642] (1966)." The way I construe the action of the bankruptcy court and the district court is that the matter was tried in the bankruptcy court as if it were a proceeding by the State of Maryland in an administrative proceeding. While this does not radically alter the result I would obtain, it makes stronger my argument that the bankruptcy court as well as the district court erred in not considering class action treatment for the individual claims of those whom Edmond is claimed to have defrauded. Since this adversary action in the bankruptcy court is in the nature of an original proceeding, there is less reason not to follow Rule 23 than if, in truth, an enforceable administrative judgment had been rendered.
 
 
 47
 The State of Maryland has not obtained any kind of judgment in favor of Maryland in this proceeding. While the complaint in the adversary proceeding asked for that relief, the only order of the bankruptcy court with any effect on the merits of this case is its order entered on October 19, 1988. That order only holds that "... the following debts of John Edmond, the debtor/defendant, are nondischargeable: ... [all claims arising after October 1, 1985, as set forth specifically in an attachment and eleven additional individual claims]." So the only proper subject of this litigation is whether the claims could have been held to be nondischargeable, not whether the State of Maryland was entitled to a judgment in its own behalf, for in all events, Maryland does not have such a judgment.
 
 II.
 
 48
 For the moment, I do not contest the conclusion of the majority that the Maryland Consumer Protection Act permits the State to proceed as parens patriae in a proper case, and do not contest the State's right to enforce any judgment it may obtain in its own name under that Act.
 
 
 49
 What I do disagree with is affirming the holding of the bankruptcy and district courts which held that all of the numerous individual claims are not dischargeable without any inquiry as to whether those claims should have been subject to class action treatment under Rule 23.
 
 
 50
 As the majority takes pains to point out at pages 1311 and 1312 of its opinion, a Consumer Protection Act remedy through the office of the Attorney General of Maryland is separate and in addition to a private right of action. Yet the holding of the district court which we affirm explicitly provides that these private rights of action are nondischargeable without treating them as being subject to a class action.
 
 
 51
 It is enough that the State of Maryland vindicates any rights the State may have under its Consumer Protection Act; we go too far when we permit the State to litigate on behalf of a class without even an elementary compliance with Rule 23.
 
 
 52
 While the subject of whether or not the State is a proper class representative under Rule 23 has not been discussed, for the moment I would assume that it is. I would vacate the holding of the district court as it affects the individual claims, and would remand the case to ascertain whether or not the State is such a proper class representative and, if so, the validity of its contention that the class action question can be litigated after liability is determined, or presently. Depending on the answer to these questions, the judgment of the district court should be made to accord.
 
 
 
 [1]
 The Division apparently urged that the hearing officer's Proposed Findings of Fact and Conclusions of Law should have preclusive effect on the nondischargeability determination. The bankruptcy judge, however, decided that the findings were not entitled to issue preclusion. The judge reexamined the evidence under 11 U.S.C. Sec. 523(a)(2)(A). He disallowed "an exception to discharge for costs awarded the Maryland Attorney General in investigating and prosecuting the proceeding before the hearing officer." In addition to the determination that all consumer claims arising after October 1, 1985 were nondischargeable, the judge also made "individual findings" with respect to the "particularly helpful" testimony of individual consumers which was "offered either by deposition or in court." A few of these arose before October 1, 1985. The additional individual claims did not arise from private rights of action but from witnesses who testified for the Division's action
 
 
 [2]
 With respect to a further request by Edmond for Rule 11 sanctions, the judge noted,
 this Court expresses its concern over appellant's repeated attempts to use the Rule 11 mechanism in an irresponsible effort to divert the attention of his adversary and the courts from the merits of the case. It is only the Court's desire to put an end to devoting time and attention to ancillary matters that has restrained it from sua sponte imposing sanctions on the appellant for his conduct.
 
 
 [3]
 Edmond had also appealed the decision on the merits, i.e., that refusal to discharge was proper, to the district court. The judge rejected that portion of the appeal. Edmond has not pursued the claim on appeal to this court
 
 
 [4]
 Indeed, in Parcels of Land, the defendant had consented to a deposition but refused to answer particular questions concerning certain activities. Here, Edmond apparently has refused to participate in any deposition
 
 
 [5]
 Edmond also has raised an objection to "surprise tactics." In brief, Edmond's contention is that the court permitted the Division to introduce "18 witnesses and over 50 exhibits containing thousands of entries, none of which appellant was privy to prior to trial." The argument lacks merit. Neither party appears to have filed a pretrial exhibit list. And in an earlier memorandum, the Division attempted to explain that its failure to do so was due to the necessity of conducting discovery until shortly before trial--a necessity created by Edmond's apparent failure, in any way, to assist discovery. As to the number of exhibits, many of them appear to have been bank records of Edmond's business and exhibits from Edmond's own civil action against a former landlord which Edmond lost
 
 
 [6]
 At the same time, the Court also decided that the Division had to "provide a procedure for processing individual consumer claims" to avoid giving purchasers who were not deceived "an 'automatic' refund." 304 Md. at 781, 501 A.2d at 74. Similarly, in State v. Andrews, 73 Md.App. 80, 87-89, 533 A.2d 282, 286-87 (1987), the court required the Division to establish a procedure to identify consumers who merited refunds. Whether the Division will be required to establish such a procedure here is not an issue before us
 
 
 [7]
 The court found that, in the alternative, the Attorney General also had standing as a class representative. The court emphasized that the class representative and parens patriae arguments constituted two "distinct grounds" for standing, either of which the Attorney General could employ. 40 B.R. at 596. The class action argument appears to have been present because the Michigan Consumer Protection Act authorized the Attorney General to bring a class action, id. at 597, and the Attorney General wanted to obtain disgorgement to "a well-defined class of specific members." Id. at 600
 
 
 [8]
 We emphasize that we only uphold the nondischargeability decision. We express no opinion as to the proper relation between the bankruptcy court's decision of nondischargeability under Sec. 523(a)(2)(A) and the administrative hearing officer's findings and conclusions. As the Division noted, "[t]he appropriateness of any future action by individual consumers or by the Division to obtain a judgment against Mr. Edmond and to collect its judgment is not before this Court nor is it relevant to this proceeding."